**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1933**

CURTIS B. PEARSON MUSIC COMPANY; CURTIS B. PEARSON; ROBERT
C. PEARSON,

        Plaintiffs - Appellants,

    v.

WILLIAM S. EVERITT,

        Defendant – Appellee,

    and

MCFADYEN MUSIC, INCORPORATED; BROOK MAYS MUSIC COMPANY,

        Defendants.

Appeal from the United States District Court for the Middle
District of North Carolina, at Durham. James A. Beaty, Jr.,
Chief District Judge. (1:04-cv-00378-JAB)

Argued: January 26, 2010        Decided: March 2, 2010

Before GREGORY and DUNCAN, Circuit Judges, and Catherine C.
BLAKE, United States District Judge for the District of
Maryland, sitting by designation.

Affirmed by unpublished opinion. Judge Blake wrote the opinion,
in which Judge Duncan joined. Judge Gregory wrote a separate
opinion concurring in part and dissenting in part.

Ralph Hayes Hofler, III, HAYES HOFLER, PA, Durham, North Carolina, for Appellants. Richard Steven DeGeorge, ROBINSON, BRADSHAW & HINSON, PA, Charlotte, North Carolina, for Appellee.

—————————

Unpublished opinions are not binding precedent in this circuit.

BLAKE, District Judge:

Curtis B. Pearson Music Company, Curtis B. Pearson, and Robert C. Pearson ("Appellants" or "the Pearsons") appeal the district court's entry of judgment against them on their claims against William S. Everitt for unfair and deceptive trade practices under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, and fraud under North Carolina common law. Following a bench trial, the district court found that Mr. Everitt lacked the intent to deceive required to state a claim for fraud. Furthermore, the district court held that Mr. Everitt's actions did not rise to the level of an unfair or deceptive trade practice prohibited under North Carolina law. For the reasons that follow, we affirm.

I.

The district court found the facts to include the following. Until August 7, 2000, Curtis Pearson served as the President of the Curtis B. Pearson Music Company ("Pearson Music"), which owned and operated retail music stores in North Carolina and South Carolina. Curtis Pearson's son, Robert Pearson, worked as a full-time employee and manager for Pearson Music. Mr. Everitt is the President of Brook Mays Music Company

3

("Brook Mays"), a music retail business based in Texas.[1] In mid-2000, Curtis Pearson began negotiations with Mr. Everitt for the sale of Pearson Music to Brook Mays. Curtis Pearson and Mr. Everitt met on June 27, 2000 to discuss the terms of the sale in detail. Vincent McBryde, a Brook Mays business consultant, also attended and took notes of the meeting.

In connection with an asset purchase agreement, the parties discussed an agreement whereby Curtis and Robert Pearson would be paid certain amounts individually. Curtis Pearson would receive $500,000 in five annual $100,000 installments after the sale and Robert Pearson would receive $100,000 in five annual $20,000 installments. The Pearsons and Mr. Everitt now disagree over exactly what consideration was agreed upon at the June 27 meeting in exchange for these five-year payments. The Pearsons claim that they promised not to compete with Brook Mays in consideration of these payments and that Robert Pearson's payment was also in consideration of the rights to musical instrument websites he had created. Mr. Everitt, however, asserts that the Pearsons also agreed that these payments would stop upon the termination of their at-will employment with Brook

---

[1] Brook Mays acquired McFadyen Music, Inc. in May 2000. Mr. Everitt continued as President of Brook Mays, the successor company. The district court dismissed claims against McFadyen Music, Inc. due to this acquisition and merger.

4

Mays. While Mr. McBryde's notes from the June 27 meeting are ambiguous on the issue, Mr. McBryde also testified at trial that the payments were contingent on continued employment.

Following the June 27 meeting, Mr. Everitt transmitted Mr. McBryde's meeting notes to Brook Mays's attorney, David Earhart, and also left a voice mail, and instructed him to prepare a draft agreement. Neither the July 6, 2000, nor the July 14, 2000, draft agreements sent to Curtis Pearson by Mr. Earhart, however, contained any mention of an employment contingency. Instead, they simply stated that the installment payments would be contingent on the Pearsons not disclosing trade secrets, not competing with Brook Mays for five years after the date of the closing or the cessation of their employment with Brook Mays, and not inducing Brook Mays's employees to leave the company during the non-compete period. Although Mr. Everitt asked Mr. Earhart to add the continued employment contingency to the July 14 draft, Mr. Earhart failed to do so.

Curtis Pearson reviewed the July 14 draft agreement in detail with an attorney and both Pearsons indicated their approval to Mr. Earhart. At Mr. Everitt's behest, Mr. Earhart subsequently added the continued employment provision to the contract. Mr. Everitt asserts that he faxed a copy of the amended agreement to the Pearsons on August 4, 2000, but they claim to have never received it. The district court found that

5

Mr. Everitt intended to fax the revised draft to the Pearsons but was not successful in doing so. On August 7, 2000, Mr. Everitt travelled to North Carolina for the closing and presented Curtis Pearson with the amended agreement for signing. Mr. Everitt did not point out the revision because he believed the Pearsons had already received the faxed copy of the amended agreement. Before signing the agreement, Curtis Pearson asked Mr. Everitt, "Is this the contract we agreed to?" J.A. 551. In response, Mr. Everitt answered "yes." Id. Curtis and Robert Pearson signed the contract without reading it.

Until 2002, the Pearsons continued to work for Brook Mays as at-will employees and received their annual installments, in addition to their regular salaries and sales commissions, pursuant to the contract. In response to Brook Mays managers reducing the scope of the Pearsons' sales territory, Robert Pearson resigned in 2002. Soon after, Brook Mays informed Curtis Pearson that they also considered him to have resigned. Upon the Pearsons' departure from Brook Mays, their installment payments ended, leaving an unpaid balance of $400,000 as to Curtis Pearson and $60,000 as to Robert Pearson. Neither of the Pearsons violated the non-compete provisions of the agreement during this time period. On April 22, 2002, the Pearsons learned of the employment contingency provision in the final version of the contract.

On April 6, 2004, the Pearsons and Pearson Music filed a complaint in state court against Brook Mays and Mr. Everitt, in his individual capacity, alleging (1) breach of contract, (2) fraud and breach of fiduciary duty, and (3) unfair and deceptive trade practices. The defendants removed the case to the U.S. District Court for the Middle District of North Carolina on April 29, 2004. As Brook Mays filed for bankruptcy after the case was removed to federal court, the district court dismissed all claims and counterclaims involving Brook Mays without prejudice. Given that Mr. Everitt did not sign the purchase contract in his individual capacity, the district court found the breach of contract claim not applicable to him. Instead, the district court held a bench trial in January 2007 on the (1) fraud or breach of fiduciary duty and (2) unfair and deceptive trade practices claims against Mr. Everitt personally. The Pearsons now appeal the district court's denial of their claims against Mr. Everitt.[2]

---

[2] In addition to appealing the district court's judgment, the Pearsons initiated a separate cause of action against Mr. Earhart and his law firm, claiming that they defrauded the Pearsons in drafting the contract at issue in this case. See Pearson v. Gardere Wynne Sewell LLP, No. 08-0919-JAB (M.D.N.C.). We granted Mr. Everitt's motion to take judicial notice of the complaint in that case (hereinafter "Appellants' Second Compl.").

II.

We review a district court's determination of legal questions de novo. See South Atlantic Ltd. v. Riese, 284 F.3d 518, 535 (4th Cir. 2002). We may set aside a district court's factual findings following a bench trial only if they are clearly erroneous. See Ellis v. Grant Thornton LLP, 530 F.3d 280, 286 (4th Cir. 2008); Fed. R. Civ. P. 52(a). "A finding of fact is clearly erroneous when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Ellis, 530 F.3d at 287 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). In addition, if "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985).

As the court has diversity jurisdiction over this case, it must interpret the law in accordance with the highest court in North Carolina. See Wells v. Liddy, 186 F.3d 505, 527-28 (4th Cir. 1999). Where the law is unclear, the court must predict how the Supreme Court of North Carolina would rule, considering: "canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the

state's highest court, well considered dicta, and the state's trial court decisions." Id. at 528.

## III.

We turn first to Appellants' argument that the district court erred in dismissing their fraud claim. Under North Carolina law, a plaintiff must prove that the defendant had the "intent to deceive" in order to prevail on a claim for fraud. See Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 374 S.E.2d 385, 391-92 (N.C. 1988). Appellants first argue that the district court ignored its own factual findings by concluding that Mr. Everitt lacked the requisite intent to deceive. They note the district court's finding that Mr. Everitt made "false representations to Plaintiffs regarding the content of the agreement" by replying "yes" when Curtis Pearson asked him if the contract he was about to sign was the one to which they had previously agreed. J.A. 554-55. Yet the district court also found that Mr. Everitt intended to give Curtis Pearson an honest answer to his question about the contract, finding that Mr. Everitt believed that the parties had discussed the employment contingency provision at the June 27 meeting and that the Pearsons had seen the faxed copy of the revised agreement. Id. at 555. The district court's characterization of Mr. Everitt's statement to Curtis Pearson as factually untrue does not negate

9

its overall finding that Mr. Everitt made an honest mistake. Thus the district court's factual findings support its legal conclusion that Mr. Everitt lacked the intent to deceive necessary to prove fraud.[3]

In the alternative, Appellants argue that the district court's factual findings as to Mr. Everitt's intent are clearly erroneous. They note that the year and a half that passed between the bench trial and the district court's decision may have clouded the court's recollections from the trial. Given the ambiguity in the notes from the June 27 meeting, the testimony of Mr. McBryde supporting Mr. Everitt's recollection of what was discussed June 27, and Mr. Everitt's testimony that Mr. Earhart failed to add the employment provision to the July 14 draft as he had requested and that he believed the Pearsons were aware of the employment contingency provision, however, the district

---

[3] The district court also held that the Pearsons had failed to establish a claim for "constructive fraud," or breach of fiduciary duty, which the Pearsons have not challenged on appeal. Based on the court's findings that the Pearsons were "experienced businesspeople," that Mr. Everitt was not in a "confidential, advisory, or otherwise close relationship with them," and that the parties engaged in an arms-length business transaction, the court properly denied the Pearsons' constructive fraud claim. J.A. 557-58.

court's finding that Mr. Everitt unintentionally misled the Pearsons is a permissible interpretation of the evidence.[4]

The Pearsons' allegations in their subsequent complaint against Mr. Earhart and his law firm further support the district court's findings of fact. In this complaint, the Pearsons allege that "Everitt believed that the Pearsons had already agreed to the termination contingency provisions which he had instructed his attorney, Earhart, to include for review." (Appellants' Second Compl. ¶ 14.) They also assert that Mr. Everitt did not provide copies of the final agreement to the Pearsons "because he believed the Pearsons had reviewed and approved the agreement." Id. at ¶ 15. Generally, a party is bound by admissions in its pleadings. See Lucas v. Burnley, 879 F.2d 1240, 1242 (4th Cir. 1989). Although this later pleading was filed in a different lawsuit, Pearson v. Gardere Wynne Sewell LLP, its allegations relate to the same events at issue in this case. Thus Appellants' admissions in this subsequent pleading relating to Mr. Everitt's good faith, whether or not binding in this case, at least support our conclusion that the

---

[4] As Mr. Everitt points out in his brief, Curtis Pearson's recollection of events at trial was not always reliable. (Appellee's Br. 4.) Although Curtis Pearson denied during his deposition that the $500,000 payment was discussed at all during the June 27 meeting, he testified at trial that the payment was indeed discussed at the meeting. See J.A. 151, 154.

district court did not clearly err in finding that Mr. Everitt made an honest mistake rather than an intentional misrepresentation. Finding that the Pearsons have not sustained their burden of showing clear error in the district court's factual determinations, we conclude that the district court did not err in denying their claim for fraud.

IV.

Appellants also contend that the district court erred in holding that Mr. Everitt had not engaged in unfair or deceptive trade practices under the UDTPA.[5] We have earlier noted that "[w]hat constitutes an unfair or deceptive trade practice is a somewhat nebulous concept." Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, 80 F.3d 895, 902 (4th Cir. 1996). Unfairness and deception have been identified as distinct bases for liability under the UDTPA. See id. at 903; Johnson v. Phoenix Mut. Life Ins. Co., 266 S.E.2d 610, 621 (N.C. 1980), abrogated on other grounds by Myers, 374 S.E.2d at 391-92. For a trade practice to be deceptive, it need not be untruthful, it simply

---

[5] "In order to establish a violation of the [UDTPA], a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Gray v. N.C. Ins. Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000). The latter two elements are not at issue on appeal as the district court based its ruling solely on its conclusion that the conduct at issue did not constitute an unfair or deceptive act.

12

must have the "capacity or tendency to deceive." Johnson, 266 S.E.2d at 622. Furthermore, an actor's good faith has been described as irrelevant to the question of whether his conduct was deceptive. Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981). A practice is "unfair" under the UDTPA, however, "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Id.

Given that the UDTPA provides for treble damages, courts have been reluctant to classify every instance of wrongdoing in business transactions as a violation of the UDTPA. To prevail on an UDTPA claim, plaintiffs must demonstrate "some type of *egregious* or *aggravating* circumstances." Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001) (italics in original) (internal quotations and alterations omitted); see also South Atlantic, 284 F.3d at 535 (describing the "egregious or aggravating circumstances" requirement as a limit on the UDTPA's application); Hancock v. Renshaw, -- B.R. --, 2009 WL 4840231, at *4 (M.D.N.C. Dec. 11, 2009) (holding that a defendant's willful conversion did not constitute an unfair or deceptive trade practice in and of itself under the UDTPA; there needed to be sufficient egregious or aggravating factors in addition). Moreover, North Carolina courts look largely to the practice's impact on the marketplace in determining whether conduct is

13

deceptive or unfair. See Marshall, 276 S.E.2d at 403 (noting that "[w]hether a trade practice is unfair or deceptive usually depends on the facts of each case and the impact the practice has in the marketplace"); Carcano v. JBSS, LLC, 684 S.E.2d 41, 50 (N.C. Ct. App. 2009) (explaining that "[t]he 'relevant gauge' of an act's unfairness or deception is '[t]he effect of the actor's conduct on the marketplace'") (quoting Ken-Mar Finance v. Harvey, 368 S.E.2d 646, 648 (N.C. Ct. App. 1988)).

In Carcano, the court refused to conclude that the defendants' recruitment of the plaintiffs into a fictional limited liability company, which involved "deception, lies, and misrepresentations," was an unfair or deceptive trade practice. Carcano, 684 S.E.2d at 50-51 (internal quotation marks omitted). The court based its decision primarily on the fact that the conduct simply involved a request to invest in a business arrangement among "sophisticated business entrepreneurs." Id. at 50. As the court noted, the UDTPA "does not apply to all wrongs in a business setting." Id.[6]

---

[6] Contrary to the dissent's assertion, Carcano was not a "situation in which a third-party sabotages the business dealings of a plaintiff and a defendant." Dissent.Op. at n.3. Rather, as in this case, Carcano concerned the aftermath of a defendant's mistaken belief about a business transaction. Although the defendants in Carcano also suffered as a result of this misconception, this does not alter the court's analysis as to the level of egregiousness required under the UDTPA and the (Continued)

14

The Pearsons have not demonstrated any egregious or aggravating factors at work in this case. Instead, based on the district court's findings, Mr. Everitt is guilty only of a mistaken belief with regard to a specific transaction, having little impact on the general marketplace. Misunderstandings, despite their capacity to deceive, ordinarily are insufficient to sustain a claim of deceptive conduct under the UDTPA. See Rice v. Vitalink Pharmacy Servs., Inc., 124 F. Supp. 2d 343, 348 (W.D.N.C. 2000) (concluding that "a mutual misunderstanding between the parties" did not give rise to a claim for deceptive trade practices); Cockman v. White, 333 S.E.2d 54, 55 (N.C. Ct. App. 1985) (holding that "[w]e do not believe the misunderstanding between plaintiff and defendant constituted a deceptive representation").[7]

---

importance of a trade practice's effect on the marketplace. 684 S.E.2d at 50.

[7] The dissent, in elaborating its theory of "objective" egregiousness, relies heavily on Pearce v. American Defender Life Ins. Co., 343 S.E.2d 174 (N.C. 1986). We note that Pearce involved a suit by a widow against an insurance company for failure to pay on a policy. A separate statute governs unfair or deceptive trade practices in the insurance industry under North Carolina law, including misrepresentations about policy terms. See N.C. Gen. Stat. § 58-54.4. In Pearce the court held "that a violation of [N.C. Gen. Stat.] § 58-54.4 as a matter of law constitutes an unfair or deceptive trade practice in violation of [N.C. Gen. Stat.] § 75-1.1." 343 S.E.2d at 179. Thus we believe Pearce is distinguishable from the present circumstances.

Appellants argue, however, that Mr. Everitt's failure to disclose the addition of the employment contingency provision to the Pearsons was so unscrupulous as to qualify as an unfair trade practice under the UDTPA. In support of this proposition, they cite South Atlantic, in which this court found that the defendant's failure to disclose pertinent information was "the essence of unscrupulous behavior" and "sufficiently egregious to constitute an unfair trade practice." 284 F.3d at 538. Yet this characterization was based on a finding that the defendant "*deliberately withheld* the information" from the claimant. Id. (italics in original). As Mr. Everitt was not found to have acted deliberately in this case, his conduct does not rise to the level of unscrupulousness observed in South Atlantic. Accordingly, the district court properly ruled in favor of Mr. Everitt on the Pearsons' UDTPA claim.

V.

For the foregoing reasons, we conclude that the district court did not err in ruling against the appellants on their fraud and UDTPA claims. Accordingly, the judgment of the district court is

AFFIRMED.

16

GREGORY, Circuit Judge, concurring in part and dissenting in part:

Faced with what it suggests is an incoherent statutory scheme, the majority rewrites North Carolina law to require that a plaintiff alleging a UDTPA violation prove that the defendant engaged in intentionally deceptive conduct. North Carolina law is clear, however, that a UDTPA plaintiff need only show that the defendant's conduct was objectively egregious, irrespective of that defendant's subjective knowledge or intent. Because the district court found facts sufficient to establish that Everitt misrepresented the contents of the final contract to the Pearsons in an objectively egregious way, the Pearsons are entitled to judgment in their favor on the UDTPA claim.[1] I therefore respectfully dissent.

I.

The UDTPA, as applied and interpreted by the North Carolina courts, is not nearly as "nebulous" as the majority claims. Several things about the statute are, in fact, perfectly clear. A defendant commits an unfair trade practice when that defendant

---

[1] As to the Pearsons' fraud claim, though I believe that the Pearsons adduced evidence sufficient to prove that Everitt acted with the requisite intent to defraud, the district court did not clearly err in crediting Everitt's testimony to the contrary. I therefore concur in the majority's conclusion as to the fraud claim in Part III.

17

"engages in conduct which amounts to an inequitable assertion of its power or position." Johnson v. Phoenix Mut. Life Ins. Co., 266 S.E.2d 610, 622 (N.C. 1980). Likewise, a defendant's subjective belief or intent does not determine whether that defendant's conduct is deceptive; rather the effect that conduct would have on the average person does. Pearce v. American Defender Life Ins. Co., 343 S.E.2d 174, 180 (N.C. 1986). North Carolina courts do not require a plaintiff seeking UDTPA recovery to prove a defendant's intent to deceive precisely because the statute was designed to provide redress to plaintiffs whose fraud claims were not cognizable due to the difficulty inherent in proving a defendant's subjective state-of-mind. Marshall v. Miller, 276 S.E.2d 397, 400 (N.C. 1981). When a court considers whether the "egregious or aggravating circumstances," Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001), necessary to sustain a UDTPA claim are present, it is clear that it must do so by evaluating those circumstances objectively.

The North Carolina Supreme Court illustrated this objective inquiry in Pearce. There, the decedent, an Air Force pilot, purchased and signed a life insurance policy, which excepted death in an airplane accident from coverage. Pearce, 343 S.E.2d at 176. When the decedent later inquired whether his family would be covered were he to die in a training accident, a representative responded, in good faith, that his family would

18

be covered by the policy so long as he did not die in an act of war. Id. The decedent later died in a training accident, and the insurance company refused to pay, citing the contract's express provision. Id. The court in Pearce found that even though there was no evidence that the insurance company intended to deceive the decedent, the company could still be liable under the UDTPA because the effect of the representative's letter was to mislead a reasonable person as to the insurance contract's meaning. Id. at 181. Thus, while there was clearly an honest misunderstanding between the insurance representative and the decedent, that misunderstanding was sufficiently egregious and the insurance company was sufficiently at fault to trigger UDTPA liability.

The evidence found by the trial court here surely supports a stronger UDTPA claim than that found by the court in Pearce. The district court here found that the Pearsons never agreed to the contingency clause with Everitt. It found no objective evidence that Everitt ever mentioned the clause at any of their meetings. It determined that the clause was not included in the first two drafts written by Everitt's lawyer and reviewed by Pearson and concluded that when the clause was added, it was buried in an unaltered paragraph, with no indication that any change had been made.

Worse still, the court found that rather than send the revised agreement to the Pearsons via overnight, Federal Express delivery — the means by which the parties had previously communicated — Everitt tried, but failed, to fax the revised agreement to the Pearsons. The court found that Everitt's attempt failed because he dialed the Pearsons' voice number, not their fax number, and yet somehow did not realize that the fax did not go through.[2] And despite all of this, when it came time to close the sale, Everitt simply said "yes" when asked whether the contract Curtis Pearson was about to sign was the same one to which they had previously agreed.

This behavior from a sophisticated businessman falls squarely within the definition of unfair and deceptive conduct contemplated by UDTPA.[3] As the purchase agreement's drafter,

---

[2] As anyone who has mistakenly tried to fax a document to a voice number can attest, the fax machine's obnoxious response to this error makes it nearly impossible for a reasonable person to believe that the fax was successfully transmitted.

[3] These facts clearly distinguish this case from Carcano v. JBSS, LLC, 684 S.E.2d 41 (N.C. Ct. App. 2009), upon which the majority relies heavily. In Carcano, the plaintiffs alleged a UDTPA violation after a joint venture with the plaintiffs failed, in part, because the business entity was never incorporated. Id. at 50-51. The court held that the defendants did not abuse their position, and consequently did not violate the UDTPA, because they too did not know about the failure to incorporate and were injured, as well. Id. Carcano therefore applies to a situation in which a third-party sabotages the business dealings of a plaintiff and defendant. It does not apply to a situation like this one, in which it is the defendant (Continued)

20

Everitt had a duty to inform the Pearsons of any changes he made to the agreement after they had reviewed and agreed to it. By not taking the reasonable steps necessary to inform the Pearsons of the new provision and then subsequently enforcing it, Everitt unquestionably "engage[d] in conduct which amount[ed] to an inequitable assertion of [his] power or position." Johnson, 266 S.E.2d at 622. The myriad ways in which he failed in this area render his conduct far more egregious than the conduct that led to the honest misunderstanding between the two parties in Pearce. See 343 S.E.2d at 176. This, when coupled with the evidence at trial suggesting that Everitt attempted to cover up his failures by instructing his consultant and lawyer on how to describe the incident in subsequent legal proceedings, makes this case precisely the "near-miss" fraud scenario that the North Carolina legislature sought to redress through the UDTPA. Marshall, 276 S.E.2d at 400. In my view, the district court erred by finding otherwise.

II.

The majority eschews any objective analysis of Everitt's behavior. Despite acknowledging at the outset that good faith

who causes the harm and abuses his position by failing to reasonably disclose material information of which he is aware and the plaintiff is not.

21

is not a defense under the UDTPA, Maj. Op. at 13, it instead ultimately concludes that because Everitt did not act intentionally, his conduct is insufficiently aggravating or egregious to implicate the UDTPA. See Maj. Op. at 15 ("As Mr. Everitt was not found to have acted deliberately in this case, his conduct does not rise to the level of unscrupulousness observed in South Atlantic."). In so doing, it accepts Everitt's oversimplistic dichotomy of deliberate versus innocent conduct. Surely this choice is false.

"Aggravating" is defined simply as that which makes something worse. Webster's New International Dictionary 41 (3d ed. 1981). And "egregious" is defined as "extraordinary," "extreme," or "flagrant." Id. at 727. Neither of these words suggest, by definition, any requirement that an actor must act with specific intent in order to engage in aggravated or egregious conduct. That conduct, like Everitt's here, need only be beyond that which a reasonable person would consider to be acceptable behavior.

Likewise, the pages of the federal and regional reporters are filled with cases in which a defendant, acting with naïve and innocent intent, commits a wrong for which that defendant is held criminally or civilly liable. A child places one bullet in a gun. He points it at a friend's side and pulls the trigger multiple times before shooting and killing that friend. No

22

matter that the child did not intend to kill anyone or believe that he would; his conduct was still so objectively egregious and aggravated that he was convicted of murder. See Pennsylvania v. Malone, 47 A.2d 445, 446-49 (Pa. 1946).

Everitt's conduct here created a similarly unacceptable risk that the Pearsons would be harmed and misled, even if Everitt honestly did not intend to do so. Based on the district court's factual findings, it is clear that at every stage of the negotiations Everitt failed to make clear to the Pearsons that he intended to, or that he in fact had, inserted the termination provision into the contract. This was not a case in which contracting parties misunderstood one another because their revised agreement got lost in the mail or because each party ascribed a different meaning to a specific term than did the other one. No reasonable person in Everitt's position could have believed that he had revealed the revised-contract's provision to the Pearsons. Viewed objectively, Everitt's conduct was so far outside the mainstream of business behavior — even typical, yet improper business behavior — that his victims ought to receive redress through the UDTPA.

## III.

The North Carolina courts and legislature have seen fit to impose liability, including treble damages, on individuals or

23

corporations that deceive or misrepresent others in the course of business transactions. It is clear that the law applies where a party abuses its position relative to another, notwithstanding the offending party's innocent intentions or good faith. Though we may think the law unduly harsh or unwise, so long as it is not preempted by federal statutory or constitutional provisions, we are bound to apply it in the same way that a state court would. We are not free to engraft additional provisions that have been explicitly rejected by the state's highest court.

Consequently, I would find Everitt liable under the UDTPA and remand to the district court with instructions to enter judgment in the Pearsons' favor. I respectfully dissent.