**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 15-1899**

_____

CHAMPION PRO CONSULTING GROUP, INC.; CARL E. CAREY, JR., PH.D.,

    Plaintiffs - Appellants,

  v.

IMPACT SPORTS FOOTBALL, LLC; MITCHELL FRANKEL; TONY FLEMING; MARVIN AUSTIN,

    Defendants - Appellees,

  and

ROBERT QUINN; CHRISTINA WHITE,

    Defendants,

  and

NORTH CAROLINA DEPARTMENT SECRETARY OF STATE,

    Third Party Defendant.

_____

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. William L. Osteen, Jr., Chief District Judge. (1:12-cv-00027-WO-LPA)

_____

Argued: October 27, 2016    Decided: December 22, 2016

_____

Before WILKINSON and TRAXLER, Circuit Judges, and Bruce H. HENDRICKS, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Hendricks wrote the opinion, in which Judge Wilkinson and Judge Traxler joined.

**ARGUED:** Kevin James Dolley, James Carter Keaney, LAW OFFICES OF KEVIN J. DOLLEY, LLC, St. Louis, Missouri, for Appellants. Peter Robert Ginsberg, PETER R. GINSBERG LAW, LLC, New York, New York, for Appellees. **ON BRIEF:** Laura Spencer Garth, Mark J. Obermeyer, LAW OFFICES OF KEVIN J. DOLLEY, LLC, St. Louis, Missouri, for Appellants.

HENDRICKS, District Judge:

In December 2010, while a student at the University of North Carolina, Robert Quinn entered into a Standard Representation Agreement with Carl E. Carey, founder of Champion Pro Consulting Group, Inc. Carey thereby became Quinn's sports agent and maintained hopes to obtain lucrative opportunities for Quinn with the National Football League ("NFL"). Eight months later, Quinn terminated his Agreement with Carey and hired Impact Sports Football to represent him instead. Shortly thereafter, Quinn signed a contract with the St. Louis Rams for $4,073,468 over his first four seasons, with a signing bonus of $5,362,585.

After filing two related actions in other jurisdictions,[1] Plaintiffs filed the instant action against Impact Sports, Mitchell Frankel, Tony Fleming, and Marvin Austin,[2] alleging principally that Impact Sports engaged in deceptive and unfair practices in violation of the North Carolina Unfair and Deceptive Practices Act ("UDTPA") by their recruitment of Quinn.

---

[1] Plaintiffs filed suit in the United States District Court for the Southern District of Texas on July 25, 2011, and the Circuit Court of St. Charles County, State of Missouri on November 14, 2011. Plaintiffs voluntarily dismissed the Texas action and settled the Missouri action.

[2] Robert Quinn and his wife, Christina Quinn, were also originally named as Defendants, but were later dismissed from the case.

Following discovery, Plaintiffs moved to sanction Defendants for their alleged spoliation of evidence. After a hearing, the district court denied in part Plaintiffs' motion for sanctions and granted Defendants' motion for summary judgment on all of Plaintiffs' claims. Because the Court finds that Defendants' actions fall outside the scope of the UDTPA, we affirm.

I.

A.

Carey is a full-time associate professor at Lonestar College in Kingwood, Texas. He is also a National Football League Players Association ("NFLPA") Contract Advisor and the founder of Champion Pro Consulting Group, located in Houston, Texas. In November 2010, Quinn contacted Carey about serving as his Contract Advisor, after being introduced to Carey by a mutual friend. Carey eventually met with Quinn and his family in North Carolina, and they signed a Standard Representation Agreement ("SRA") on December 4, 2010. At the time Carey entered into the SRA with Quinn, he represented one other NFL player; Quinn was the first rookie whom he represented.

In addition to the SRA, Quinn and his father also entered a Financial Assistance Agreement ("FAA") with Carey. The FAA provided for Carey's paying Quinn and/or his father $125,000 in five (5) equal installments beginning December 4, 2010, and

4

ending on June 1, 2011. The initial payment was made in the form of $5,000 in cash to Quinn and $20,000 in a check to his father at the time of signing the SRA. The SRA did not mention the FAA and a copy of the FAA was not filed with the NFLPA. J.A. 180.

The NFL locked out its players from March 11 to July 25, 2011. During the lockout, the teams did not communicate with players and were not negotiating NFL Player Contracts. In addition, the NFLPA discontinued its agent regulation system, making it possible for agents to contact and communicate with players under existing contracts with other agents, something that is normally prohibited by the NFLPA. Defendants admit that they met with Quinn twice during the lockout, in mid-June and mid-July of 2011, and that they had wanted to represent Quinn since at least May of 2010.

The parties dispute the extent to which Defendants interacted with Quinn through intermediaries, specifically, Todd Stewart ("Stewart"), Marvin Austin ("Austin"), and Christina Quinn ("Christina Quinn"). Defendants admit that Stewart worked for Defendants on a trial basis from 2009 through 2011 and acted as an intermediary between Quinn and Impact Sports beginning in June 2011. However, they dispute the extent to which Stewart was compensated for his efforts. While Stewart claims he does not remember receiving money from Impact Sports, a former Impact

5

Sports employee, Sean Kiernan, testified in his deposition that he recalls seeing advances paid to Stewart through Western Union during 2011 and 2012, in amounts as high as $5,000 per month.

Defendants further deny that any interaction between Quinn and Austin, or between Quinn and Christina Quinn, occurred at Defendants' behest. Austin plays in the NFL for the Denver Broncos and previously played football with Quinn at the University of North Carolina. Christina Quinn began dating Quinn in 2011 and they are now married. Plaintiffs point to an email Defendant Fleming sent on July 12, 2011, in which he states that he and Austin "are making a hard push at Quinn today." J.A. 2516. They also cite a number of calls that occurred between Fleming, Austin, Stewart, and Christina Quinn. The calls between Fleming, Stewart, and Austin date back as early as November 5, 2010, and the evidence shows Christina Quinn being on calls with Fleming and Stewart starting June 6, 2011.

The NFL held a draft in April 2011, in which Quinn was drafted fourteenth in the first round by the St. Louis Rams. According to Carey, after the NFL draft, he negotiated various promotional deals on Quinn's behalf and arranged for Quinn to travel to St. Louis to look for a home in July 2011. On July 22, 2011, Quinn terminated his SRA with Carey by fax. The NFL lockout then ended, and on July 28, 2011, Quinn entered into an

6

SRA with Tony Fleming, an NFLPA certified Contract Advisor who is affiliated with Impact Sports Football based in Boca Raton, Florida. Along with the SRA, Fleming and Quinn entered into a Marketing Advance Agreement, wherein Fleming advanced Quinn $100,000 to be repaid out of any future marketing income that Fleming generated for him. According to Defendants, the advance was disclosed to and accepted by the NFLPA. J.A. 75. On August 4, 2011, Quinn signed a contract with the St. Louis Rams for $4,073,468 over his first four seasons with a signing bonus of $5,362,585.

On January 13, 2012, Carey filed a grievance with the NFLPA, alleging that Quinn breached their SRA and claiming he was entitled to quantum meruit for the reasonable value of his services. The Arbitrator found that Carey was entitled to an award of $17,500, which compensated Carey for 70 hours of work as a Contract Advisor at an hourly rate of $250.

Plaintiffs filed suit in federal court on January 9, 2012, asserting five claims: (1) unfair methods of competition; (2) tortious interference; (3) slander per se; (4) civil conspiracy; and (5) unjust enrichment. The district court dismissed three of the claims after Defendants moved to dismiss the complaint, leaving only the claims for unfair methods of competition and civil conspiracy. Following discovery, Defendants moved for summary judgment on the remaining claims. Plaintiffs then filed

7

a motion for sanctions in the form of default judgment or an adverse jury instruction directed against Defendants, alleging that the Defendants lost or deleted critical electronically-stored evidence, namely, text messages. On July 15, 2015, the district court denied in part and granted in part Plaintiffs' motion for sanctions and granted Defendants' motion for summary judgment on all remaining claims.

This appeal followed.

## II.

## A.

We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to Plaintiffs, the nonmovant. See Askew v. HRFC, LLC, 810 F.3d 263, 266 (4th Cir. 2016). We may affirm "on any legal ground supported by the record and are not limited to the grounds relied on by the district court." Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir. 1993). Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because we are sitting in diversity and addressing matters of North Carolina law, we apply governing North Carolina law or, if necessary, predict how the Supreme

Court of North Carolina would rule on an unsettled issue. See Askew, 810 F.3d at 266.

B.

Plaintiffs first argue that the district court erred in granting summary judgment on their claim that Defendants violated the UDTPA. The district court found that even if Defendants acted in the manner alleged by Plaintiffs, such conduct would not violate the UDTPA as a matter of law. Plaintiffs disagree, arguing that Defendants committed unfair and deceptive acts or practices by: (1) illegally using "runners" to recruit Quinn as a client; (2) paying a large amount of money to Quinn in the form of a "Marketing Advance" as a means of inducing him to terminate his SRA with Plaintiffs; and (3) committing these acts as a means of retaliating against Plaintiffs. Defendants deny these allegations and assert that there was nothing nefarious in giving Quinn a Marketing Advance, a type of transaction typical in the industry. In Defendants' view, the conduct alleged by Plaintiffs, even if taken to be true, cannot establish any unfair or deceptive practices within the scope of the UDTPA. They contend that Carey has already arbitrated his grievance in the proper forum through the NFLPA, and that the UDTPA was not meant to address perceived wrongs in recruitment practices by Contract Advisors.

9

Because we agree with the district court that Plaintiffs' allegations, even when assumed to be true, are insufficient to establish a violation of the UDTPA, we address the factual disputes only briefly and focus instead on the legal issues presented.

To state a claim under the UDTPA, a claimant must allege (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which proximately caused injury to the plaintiff or his business. See N.C. Gen. Stat. § 75-1.1; Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 653 S.E.2d 393, 399 (2007); Dalton v. Camp, 353 N.C. 647, 548 S.E.2d 704, 711 (2001). Conduct in violation of the UDTPA must be immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. See, e.g., Gilbane Bldg. Co. v. Fed. Reserve Bank, 80 F.3d 895, 902 (4th Cir.1996); Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 418 S.E.2d 694, 700 (1992). An act is deceptive if it has a tendency or capacity to deceive. Dalton, 353 N.C. at 656, 548 S.E.2d at 711; Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397, 403 (1981). An act is unfair "if it offends established public policy," "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," or "amounts to an inequitable assertion of . . . power or position." Carcano v. JBSS, LLC, 200 N.C. App. 162, 684 S.E.2d 41, 50 (2009) (quotation omitted) (emphasis removed);

10

see Gilbane Bldg. Co., 80 F.3d at 902. "Whether an act or practice is unfair or deceptive under the UDTPA is a question of law for the court." Kelly v. Ga.-Pac., LLC, 671 F. Supp. 2d 785, 798-99 (E.D.N.C. 2009) (collecting cases).

In a recent opinion, this Court noted that the UDTPA's provision for treble damages has made courts "reluctant to classify every instance of wrongdoing in business transactions as a violation of the UDTPA." Curtis B. Pearson Music Co. v. Everitt, 368 F. App'x 450, 455-56 (4th Cir. 2010); see also Wilson v. Blue Ridge Elec. Membership Corp., 157 N.C. App. 355, 578 S.E.2d 692, 694 (2003) ("N.C. Gen. Stat. § 75-1.1 was not meant to encompass all business activities or all wrongdoings in a business setting but 'was adopted to ensure that the original intent of the statute . . . was effectuated.'"). Indeed, to "prevail on an UDTPA claim, plaintiffs must demonstrate 'some type of egregious or aggravating circumstances.'" Id. Here, the allegations made by Plaintiffs, even if taken to be true, do not establish egregious or aggravating conduct sufficient to establish a UDTPA claim.

Plaintiffs first allege that Impact Sports violated the UDTPA by using runners to recruit Quinn away from Carey. "Runner" is a term of art used in the sports industry to refer to "any individual who performs errands for a sports agent or agency, including offering players benefits and money to entice

11

them to become clients." J.A. 2066. Plaintiffs claim that Defendants engaged Marvin Austin, Todd Stewart, and Christina Quinn as runners to "secretly recruit" and "solicit" Quinn and to "poison him against Carey." Plaintiffs argue that this conduct violates public policy and is both unfair and deceptive under the UDTPA. Plaintiffs further allege that Defendants violated the UDTPA by giving Quinn a $100,000 "Marketing Advance" to induce him to terminate his SRA with Carey. According to Plaintiffs, because Defendants never intended for Quinn to pay back this advance, the payment was unfair and deceptive.

Even if these allegations are taken to be true, an assumption we make only to get to the heart of this case, we believe that such activity is indicative of the industry in which these parties operate and falls outside the scope of business activities the UDTPA is designed to address. To support their claims, Plaintiffs assert that certain regulations under the North Carolina Uniform Athlete Agents Act ("UAAA") and NFPLA prohibit the use of runners. They also cite numerous news articles indicating that the practice of using runners is reviled by many in the industry. However, rather than support Plaintiffs' claims, the evidence they cite indicates that the business activities of Contract Advisors are already subject to an extensive regulatory regime under the NFLPA.

12

For example, the NFLPA has carefully crafted regulations to manage the business relationships at issue here, specifically, between players and agents and between agents and agents. Recognizing the potential for unfair or deceptive practices among agents, the NFLPA has created the NFLPA Regulations Governing Contract Advisors ("Regulations"). It amended these Regulations in June 2012 to expressly forbid the use of runners.[3] While this regulation was not in effect when Quinn entered into an SRA with Impact Sports, its creation indicates that the NFLPA was aware of the issues that using runners presented and that it has taken significant steps to internally police such conduct. Further, the Regulations expressly prohibit Contract Advisors from "[e]ngaging in unlawful conduct and/or conduct involving dishonesty, fraud, deceit, misrepresentation, or other activity which reflects adversely on his/her fitness as a Contract Advisor or jeopardizes his/her effective representation of NFL players." (NFLPA Agent Regulations at Section 3). Violators of this regulation are subject to arbitration proceedings. (NFLPA Agent Regulations at Section 5). Given the well-established internal systems of governance already in place, we decline to

---

[3] The collegiate football industry also internally regulates the practice of using runners. The UAAA prohibits contact with a student-athlete unless the agent is registered with the North Carolina Secretary of State. See UAAA Art. 9 § 78C-98(b)(1).

13

impose an additional statutory mechanism to govern the alleged conduct.

Such an imposition would conflict with North Carolina's treatment of the UDTPA. As stated by the Western District of North Carolina in a recent opinion, "North Carolina courts have refused to apply the UDTPA to . . . matters already under 'pervasive and intricate regulation' by other statutory schemes that contain separate enforcement, supervisory, and remedial provisions." Hagy v. Advance Auto Parts, Inc., No. 3:15-CV-509-RJC-DCK, 2016 WL 5661530, at *2 (W.D.N.C. Sept. 28, 2016) (quoting Skinner v. E.F. Hutton & Co, Inc., 314 N.C. 267, 333 S.E.2d 236, 241 (1985)). Recognizing that the "UDTPA's broad language and provision for treble damages" has led to its inclusion "in most every complaint based on a commercial or consumer transaction in North Carolina," Judge Conrad noted that courts have found this remedy inappropriate "where there already exists an extensive regulatory regime to address the violations." Hagy, 2016 WL 5661530, at *2. This is "because such a remedy under those circumstances would improperly create overlapping supervision, enforcement, and liability in this area." Id. (quoting Wake County v. Hotels.com, LP, 2007 WL 4125456 (N.C. Sup. Ct. Nov. 19, 2007) (internal quotations omitted)); see also Skinner, 314 N.C. at 275, 333 S.E.2d at 241 (holding that the UDTPA does not apply to securities

14

transactions because they are subject to "pervasive and intricate regulation"); Bache Halsey Stuart, Inc. v. Hunsucker, 38 N.C. 414, 248 S.E.2d 567, 570 (1978) (holding that the UDTPA does not apply to commodities transactions because they are subject to a "pervasive" federal scheme).

While admittedly not a statutory scheme, the NFLPA has created an extensive regulatory regime to govern business activities within the industry. It has provided a remedy for violations in the form of monetary damages and a means to obtain that remedy through arbitration. Plaintiffs themselves recognize that the NFLPA views itself as a "self-regulating" industry. Thus, were the Court to find the UDTPA applicable here, we would risk improperly creating "overlapping supervision, enforcement, and liability in" the NFLPA's regime no different in kind from that which Hagy cautioned against. Hagy, 2016 WL 5661530, at *2.

We also would have to ignore the practical workings of this industry. For example, the Marketing Advance complained of by Plaintiffs appears to be a practice designed to maximize player choice. While the Regulations do not touch on the appropriateness of Marketing Advances, or other similar types of payments, the evidence indicates that such payments are common in the industry and implicitly approved by the NFLPA. The record reveals that Carey himself made a large payment to Quinn

15

when solidifying their business relationship, with no apparent expectation of repayment. Specifically, he agreed to pay Quinn and/or his father $125,000 pursuant to a Financial Assistance Agreement, and he paid them a portion—$25,000—on the day they entered into the SRA. Carey's own conduct indicates that these kinds of payments are accepted as part of doing business in this industry and would not be considered unfair or deceptive by the NFLPA. This is particularly true for Defendants' Marketing Advance to Quinn, which was disclosed to and approved by the NFLPA. The industry's implicit, and sometimes explicit, approval of these types of payments demonstrates a tactical understanding of the business relationships at issue that we would be unwise to disrupt.

Moreover, in the business relationships at issue here, there is no inherent imbalance of power that would make a statute like the UDTPA particularly necessary or beneficial to apply. "[T]he fundamental purpose of the U[D]TPA is to protect the consumer, and courts invariably look to that purpose in deciding whether the act applies." Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 520 (4th Cir. 1999). Here, no protection is needed beyond the internal system of governance already in place. The parties in this case are not in a business relationship of unequal power. Rather, the business relationships at issue are demonstrative of the competitive

16

nature of NFL recruiting and involve Contract Advisors of sufficiently similar business sophistication and means.

Plaintiffs' final allegation, that Defendants' actions were motivated by a retaliatory animus, does not alter our finding. Plaintiffs argue that Defendants harbored a retaliatory animus against Carey because of disparaging comments Carey made about Fleming in 2002, when Fleming was trying to recruit NFL player Julius Peppers ("Peppers"). Peppers opted against signing with Impact Sports and eventually signed with Carey. Plaintiffs claim that Defendants resented Carey as a result. Defendants assert that they had no knowledge of Carey's alleged comments to Peppers about Impact Sports until Carey filed this action, and Plaintiffs have not provided any direct evidence to contradict this assertion. We agree with the district court that the evidence submitted to support this claim "is little more than allegations, conjecture, and speculation." J.A. 3876.

However, even if we were to assume Defendants' actions were retaliatory in nature, such a finding does not bring Plaintiffs' claims within the scope of the UDTPA. North Carolina courts have typically found a UDTPA violation where the alleged retaliation is particularly egregious and without any legitimate business purpose. See Shepard v. Bonita Vista Props., L.P., 191 N.C. App. 614, 664 S.E.2d 388, 392 (2008), aff'd, 363 N.C. 252, 675 S.E.2d 332 (2009) (finding a UDTPA violation where an RV

17

park owner turned off a resident's power in retaliation for reporting the RV park to the local health depart and where the park owner told the resident "she would 'fix' her"); see also Martin v. Bimbo Foods Bakeries Dist., LLC, No. 5:15-CV-96-BR, 2015 WL 1884994, at *8 (E.D.N.C. Apr. 24, 2015) (denying motion to dismiss UDTPA claim where plaintiff alleged that defendant charged plaintiff unreasonable expenses in the operation of his distribution route and failed to obtain the best price for plaintiff's distribution rights to punish plaintiff for opposing defendant's abusive practice toward its distributors). Here, there is no overt evidence of retaliation, and the alleged conduct can be readily explained as Defendants acting within the accepted confines of the industry in which they operate.

This Court would be remiss, therefore, to superimpose the UDTPA upon the rough and tumble of NFL recruiting, a competitive arena in which the incentives are already carefully balanced by existing policies and regulations. To do so would be to distort those incentives in a manner detrimental to players and agents alike. In sum, we find no basis to apply the UDTPA to the allegations made by Plaintiffs.

## III.

Because we find that Defendants' actions did not constitute a violation of the UDTPA, there can be no surviving claim that

18

Defendants conspired to violate this statute. Civil conspiracy requires "an underlying claim for unlawful conduct," Sellers v. Morton, 191 N.C. App. 75, 661 S.E.2d 915, 922 (2008) (quoting Toomer v. Garrett, 155 N.C. App. 462, 574 S.E.2d 76, 92 (2002)), and none remains. Accordingly, Plaintiffs' civil conspiracy claim also fails as a matter of law.

## IV.

Having granted summary judgment on Plaintiffs' remaining claims, Plaintiffs' appeal that the district court erred in failing to award sanctions in the form of an adverse jury instruction is moot. For the foregoing reasons, we affirm the district court's judgment.

AFFIRMED